David McClure, as Temporary Receiver of The Life Union, Respondent, *v.* Louis P. Levy, Appellant.

1. Assessment Life Insurance Company — Promissory Notes — Conversion of Funds by Officer. On the trial of an action for embezzlement and conversion, brought by the receiver of an insolvent assessment life insurance company against its late president, the evidence was to the effect that the defendant, before he became president and in order to gain control of the company, obtained from his predecessor in office, who testified that the defendant paid therefor more than their face value and interest, certain notes which had been executed by the company to some of its directors to raise money for an *ultra vires* and illegal scheme for the transfer of membership of another company; that these notes were

on their face not negotiable paper, and were payable out of a fund to be derived from the proposed transfer of membership, which transfer never took place; and that the defendant took the notes with full knowledge of all the circumstances surrounding their issue. The evidence further showed that, shortly before the company went out of business and when it was insolvent, the defendant, by means of a check made by his direction and signed by him as president, obtained all of the company's funds on deposit in a certain bank, which amounted to less than the face value of the notes; and that soon after the check was made out and while it was still in the defendant's possession, the directors of the company passed a resolution which purported to authorize its officers to draw from the reserve fund to pay said notes. *Held,* that the evidence showed that the withdrawal of the company's funds by the defendant was unauthorized, and justified the direction of a verdict for the plaintiff.

2. Reserve Fund. It was disputed, on the trial, whether the funds in bank, which were checked out by the defendant, were reserve funds or not; but it did appear that a portion of the moneys in bank were a part of the reserve fund. *Held,* that the question of the reserve fund was not necessarily controlling; that while there was an unauthorized interference with the reserve fund, payment of the check in question out of the general funds of the company was equally unauthorized under the circumstances.

Reported below, 79 Hun, 235.

(Argued June 13, 1895; decided October 8, 1895.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made June 15, 1894, which affirmed a judgment in favor of plaintiff entered upon a verdict directed by the court, and also affirmed an order denying defendant's motion for a new trial.

The facts, so far as material, are stated in the opinion.

*Edward Browne* for appellant. The complaint not only failed to allege, but the plaintiff wholly failed to establish, a cause of action either for moneys received by defendant in a fiduciary capacity and misappropriated by him or for moneys wrongfully withdrawn from said corporation and embezzled by him during the course of his employment as officer of such corporation. (*Moffatt* v. *Fulton,* 132 N. Y. 507; *Hillis* v. *Bleckert,* 25 N. Y. S. R. 553; *Bartlett* v. *Sutorius,* 25 N. Y. S. R. 629; *Grosvenor* v. *Sickle,* 13 N. Y. S. R. 566; Taylor

on Corp. 342, 630; *P. Bank* v. *Sharp*, 12 Miss. 75; *Wilson* v. *Termman*, 6 M. & G. 242; *Ancona* v. *Marks*, 7 H. & N. 686; *M. Co.* v. *Schenck*, 5 Wall. [U. S.] 772; *Kelley* v. *N. & A. H. R. Co.*, 141 Mass. 496; *Williams* v. *Thorpe*, 8 Cow. 202; *White* v. *O. D. S. Co.*, 102 N. Y. 660.) The Life Union not only received cash for the notes, but actually experienced an increase in membership by reason of the agreement and issuance of the notes, and the case is barren of dispute as to this fact. (*Kraft* v. *F. P. & P. Co.*, 87 N. Y. 629; *Earl* v. *Peck*, 64 N. Y. 596; *Sawyer* v. *McLouth*, 46 Barb. 350; *Lobdell* v. *Lobdell*, 36 N. Y. 327; *Worth* v. *Case*, 42 N. Y. 369; 5 Lawson's Rights & Rem. § 2246; 1 Add. on Cont. 31; Benj. on Cont. 23; *Gravely* v. *Bernard*, L. R. [18 Eq.] 518; *M. N. Bank* v. *Globe*, 101 Mass. 57.) The board of directors had power to make the agreement and issue the promissory notes. (*McCullough* v. *Moss*, 5 Den. 567; *Moss* v. *Averill*, 10 N. Y. 457; *Mott* v. *Hicks*, 1 Den. 513; *Curtis* v. *Leavitt*, 15 N. Y. 66; *Barker* v. *M. Ins. Co.*, 3 Wend. 94; *Jackson* v. *Brown*, 5 Wend. 590; *Moss* v. *Oakley*, 2 Hill, 265; *Atty.-Gen.* v. *L. & F. Ins. Co.*, 9 Paige, 470; *Safford* v. *Wyckoff*, 4 Hill, 442; *Barry* v. *M. Ex. Co.*, 1 Sandf. Ch. 280; *Moss* v. *R. L. M. Co.*, 5 Hill, 139; *Smith* v. *Low*, 21 N. Y. 299.) If this court should find that the scheme was that of consolidation and contrary to law, still the notes in the hands of *bona fide* holders for value were good and bore the impress of value. (*F. & M. Bank* v. *B. & D. Bank*, 16 N. Y. 128; *Wright* v. *P. L. Co.*, 101 Penn. St. 204; *Ridgway* v. *F. Bank*, 12 S. & R. [Penn.] 256; *P. R. R. Co.* v. *Lewis*, 33 Penn. St. 33.) The words that the notes were payable "from such portion of the income of the Life Union as may be properly applicable thereto" were mere surplusage. (*Palmer* v. *Largent*, 5 Neb. 223; *Hardley* v. *Wilkinson*, 4 M. & S. 25; *Benedict* v. *Cowden*, 49 N. Y. 402.) Defendant had no notice of any defect in the notes which would destroy their validity. (*Goodman* v. *Simonds*, 20 How. [U. S.] 343; *B. B. Bank* v. *Hoge*, 35 N. Y. 69; *Magee* v.

28

*Badger,* 34 N. Y. 247; *Parker* v. *Connor,* 93 N. Y. 128; *Goodman* v. *Harvey,* 4 Ald. & El. 870; *Murray* v. *Lardner,* 2 Wall. 110; *Seybel* v. *N. C. Bank,* 54 N. Y. 288; *Epfler* v. *Funk,* 8 Penn. St. 468; *Stevenson* v. *O'Neall,* 71 Ill. 314.)

*Frederick Geller* and *Herbert B. Turner* for respondent. The notes, for the payment of which the defendant took the money of the Life Union, were improperly issued and improperly paid out of the reserve fund. (Laws of 1892, chap. 690, § 205.) The complaint stated a sufficient cause of action to authorize the judgment. (*Moffatt* v. *Fulton,* 132 N. Y. 507.)

BARTLETT, J. This is an appeal from a judgment and order of the General Term, first department, affirming judgment on a directed verdict for plaintiff and affirming order denying motion for a new trial.

The plaintiff, as receiver of the Life Union, an insolvent insurance company conducted on the assessment plan, sued to recover of defendant the sum of $10,141.06 of the funds of the company alleged to have been embezzled and converted by him while its president.

At the close of the evidence each party asked for a directed verdict, so that the facts most favorable to the plaintiff must be taken as proved.

It appears that early in 1891 the affairs of the Life Union were in an unsatisfactory condition, the membership was falling off, and it was deemed essential that something should be done to enlarge and extend its business.

A special meeting of the directors was called for April 10, 1891, at which it was resolved, after reciting that an opportunity presented " of securing the Flour City Life Association of Rochester, N. Y., for the sum of $40,000," that such purchase should be made, and to effect it the Life Union should execute its notes for $35,000.00 at six per cent, in amounts not less than $1,000 each, payable on or before twenty-four months after date, in form as follows:

"New York, *April* 13*th*, 1891.
"$1,000.00.

"On or before twenty-four months after date the Life Union promises to pay to the order of                    One Thousand Dollars, at its office in the city of New York, from such portion of the income of said the Life Union as may be properly applicable thereto, with interest. Value received."

Eleven of these notes were subscribed for by directors, the proceeds placed in hands of J. T. Baldwin, then the president of the Life Union, as trustee for the noteholders, who paid same to one Charles F. Underhill, president of the Flour City Life Association, who surrendered to Baldwin a power of attorney and proxies from the members of his board of directors, which transaction was supposed, or pretended would, by reason of resignations of officers and directors and the election of others, give full control of the Flour City Life Association to the Life Union, and transfer to the latter the membership, property and business of the former.

Soon after this attempted transfer, which was neither consolidation nor re-insurance, the insurance department instituted judicial proceedings against the Flour City Life Association, which resulted in its dissolution.

The effect of this transaction by the directors of the Life Union can be best described by quoting from a circular issued by the executive committee of the Life Union, dated February 27, 1892, and read in evidence. The circular states : "The $35,000 notes given by the Life Union were specially printed . contract notes payable out of the expense funds derived from the transferred membership of the Flour City. No such transfer took place. Therefore, the consideration having failed, the notes are worthless. The directors have lost $11,000. The company has lost nothing."

It thus appears that there was a complete failure of consideration as to the notes in question, and that they were payable out of a fund to be derived from the transferred membership of the Flour City Life Association, which transfer never took place.

The statement that the loss had fallen upon the directors and not the company proves to have been inaccurate.

This brings us to the consideration of defendant's connection with the case.

Soon after the circular referred to was issued, and about May, 1892, the defendant became the president of the Life Union.

William H. Law, who was defendant's predecessor as president, was sworn at the trial, and his evidence stands uncontradicted by the defendant, who failed to take the stand in his own behalf.

Law swears that between February and April, 1892, defendant received the eleven notes in question from him or his associate and paid for the same $12,000, being their face value and a compromise on the balance of interest which was not figured ; he was unable to give the month of the transfer, and could not tell what portion was paid in cash and what amount in check, but thought the greater part was paid in bills. It may be remarked in passing as somewhat peculiar that defendant should have paid considerably more interest than had accrued on the notes. Law calls this transaction a compromise as to the interest.

When pressed on cross-examination Law would not admit in terms that it was agreed between him and defendant, who was not then president of the Life Union, that the payment of the $12,000 was in consideration not only of the transfer of the notes but of his resignation as president and director in order to let defendant assume these positions.

He was then asked this question :

" Did you not know the agreement provided for the payment of fourteen thousand dollars to Moody upon the resignation of certain directors, including yourself, and the turning over of the absolute control of the company to Levy " (this defendant)?

To this he made answer in part as follows, viz.:

" I cannot say I did. I will not say I did not. * * * So far as I am aware Mr. Levy never would have paid for the

notes if it had not been coupled with the resignation. He would not have got the resignation without paying for the notes. * * * I represented to him the status of those notes, and good money had been paid for them on behalf of the Life Union. I neither represented to him they were good or bad. I stated the circumstances of the issue of them, and it was for him to determine whether they were good or bad."

The defendant is thus shown to have taken the notes with full knowledge of the circumstances surrounding their issue, and he is also placed in the peculiar position of buying the paper of a company manifesting signs of financial trouble and paying more than its face value, with interest, in order to gain control of its affairs.

After acquiring the notes the defendant was made president of the company about May, 1892, as stated, and the next material event brings us to the 27th day of December, 1892, a few days before this unfortunate corporation passed into the hands of a receiver on January 12th, 1893.

A meeting of the board of directors was held after the hour of noon December 27th, 1892, at which the following resolution was passed, viz.:

"Resolved, it being apparent from notes presented, that Mr. Louis P. Levy has taken up notes to the amount of eleven thousand ($11,000) dollars, drawn by the company, we hereby authorize our officers to draw upon our reserve fund to pay such notes, with interest."

Between ten and twelve o'clock in the forenoon of the day when this resolution was passed, and before the directors' meeting was held, the defendant, then being president of the company, directed the secretary to draw a check for the sum of $10,141.06 on the National Park Bank of New York, payable to the order of cash, for all the reserve fund in that bank; the check was drawn, handed to defendant and duly certified that same day, and afterwards deposited, indorsed by defendant, and paid to him. The secretary swears he asked how to charge the matter in the cash book and was told by defendant he would tell him later, which he never did.

So that at the time the resolution was passed the defendant was in actual possession of the check.

This check was signed by defendant as president.

In view of the situation disclosed the question presents, whether the defendant was authorized to withdraw from the funds of the Life Union the amount represented by this check ?

It is too clear for argument that the proposed scheme for the Life Union to "purchase" the Flour City Life Association was neither consolidation nor re-insurance, was illegal and *ultra vires*, and the notes given to carry out the arrangement by the officers of the Life Union were without authority of law and absolutely void.

It also appears, from the facts already commented upon, that the defendant is not a *bona fide* holder of these notes, but took the same with the full knowledge of all the circumstances surrounding their issue and stands in no better position than the original payees.

In addition to this, the defendant was given full notice by the face of the notes that they were not negotiable paper under the law merchant, being payable from such portion of the income of the Life Union as might be properly applicable thereto.

The circular in evidence, and already referred to, shows that the notes were payable out of a fund to be derived from the transferred membership of the Flour City Life Association, a transfer that was never consummated and a fund which never existed.

The resolution authorizing the payment of these notes directed the officers to draw upon the reserve fund.

It was a matter of dispute at the trial whether the funds in the National Park Bank were reserve funds or not. It does appear that a portion of the moneys in this bank were a part of the reserve fund.

This question of the reserve fund, however, is not necessarily controlling; while we think the evidence warrants the conclusion that there was an unauthorized interference with

the reserve fund, which the law provides shall be held for the benefit and protection of members (Laws 1892, ch. 690, sec. 205), we are also of opinion that payment of the check in question out of the general funds of the company was equally unauthorized under the circumstances.

It is impossible to escape the conviction that the defendant fraudulently obtained possession of this money on the eve of his resignation as president and with a full knowledge of the worthlessness of the notes and that the Life Union could no longer continue in business, being hopelessly insolvent.

The appellant's counsel points out various rulings at the trial as constituting legal error, but, after a careful examination, we think the learned trial justice made a proper disposition of the case.

The judgment and order appealed from should be affirmed, with costs.

All concur.

Judgment and order affirmed.