(70 App. Div. 149.)

## McCLURE v. WILSON.

(Supreme Court, Appellate Division, First Department. March 14, 1902.)

FRAUD—EVIDENCE—DIRECTOR OF ASSOCIATION—NOTICE.

Defendant, liable to plaintiff association, on the ground of fraud, for money received in payment of its invalid notes, in case he knew that it was derived from money paid for transferring the control of the association, may be held to have had such knowledge, he having been a director, and participated in election of the new officers, and immediately afterwards resigned, and B., who gave him the money, having also been one of the old directors, a cashier of a bank, and in no way liable on the notes, though he had represented they were good security.

Appeal from trial term, New York county.

Action by David McClure, as receiver of the Life Union, against John W. Wilson. From judgment on verdict for plaintiff, and from order denying motion for new trial, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Henry D. Hotchkiss, for appellant.
David McClure, pro se.

HATCH, J. The action was brought by the plaintiff, as receiver of the Life Union, a co-operative or assessment insurance corporation, to recover a sum of money received by the defendant, which the receiver claims equitably belongs to it. The defendant was for a time acting as a director of said insurance corporation, and during that period three agreements were entered into, which had for their purpose the unlawful transfer of the control of the Life Union over to one Louis P. Levy. This contemplated transfer was a private affair, in which certain directors were interested, and the money consideration paid for its consummation accrued to their individual benefit. The first of these agreements was made on December 28, 1891; the second and third were made on February 5, 1892. The second agreement merely modified the first in some particulars. By the terms of the first and second agreements, one Horace Moody, the party of the first part, undertook to deliver to Louis P. Levy and Lucius O. Robertson, parties of the second part, the absolute control of the Life Union, together with its franchise, book accounts and moneys, property and records. Moody agreed that he would, by March 21, 1892, secure the

election of a majority of the board of directors, including the vice-president and two members of the executive committee, and that the persons composing the majority should be designated by Levy and Robertson; Moody agreeing at the same time to deliver to them the resignations of the retiring officers and directors. The consideration to Moody for doing this work was a sum of money aggregating $15,000, to be paid through a trustee in installments, under the terms of the contract. By the second agreement $2,000 of the consideration was to be paid to one D. Frank Lloyd on part fulfillment of the agreement, the time for the performance of the original agreement being extended to April 21, 1892. The parties to the third agreement were Moody, Levy, Robertson, and D. Frank Lloyd. This agreement shifted the burden of the execution of the scheme from Moody to D. Frank Lloyd, who was a business associate of, and had an office in the same suite with, William H. Law, the president of the Life Union. Under this agreement Lloyd, instead of Moody, was to receive all the money. Lloyd acted in the matter for Law. It was through Law that Lloyd first knew of the scheme to transfer the control of the Life Union to Levy. The two had talked the matter over together, and Law had asked Lloyd to enter into the negotiations and agreements. The third agreement provided, among other things, that 11 notes of the value of $1,000 each, which had been issued by the Life Union on account of the sum of $11,000 which had been advanced to it by certain parties, should be returned pro rata to Moody, Robertson, and Levy as the cash was paid to Lloyd. In April, 1891, what was known as the "Flour City deal" was in process of negotiation. This was an effort by the Life Union to secure for the consideration of $40,000 the membership of another association having a large amount of insurance. At a meeting of the Life Union directors held April 10, 1891, being prior to the time defendant became a director, the issuing of thirty-five $1,000 notes by the Life Union was authorized in the following form:

"$1,000.                                        New York, April 13th, 1891.

"On or before twenty-four months after date the Life Union promises to pay to the order of * * * one thousand dollars, at its office in the city of New York, from such portion of the income of said Life Union as may be properly applicable thereto, with interest. Value received.
                              "The Life Union,
                              "By J. T. Baldwin, Pres't.    [Seal.]
                              "Ralph Marden, Secy."

Eleven thousand dollars were raised by subscription, and notes issued to the subscribers, all being directors of the Life Union; the defendant, Wilson, who had then become a director, being one of them. He subscribed $2,000, and took two notes. The consideration to the Flour City for the transfer consisted of $5,000 in cash, $24,000 of the Life Union notes authorized as above, and the $11,000 raised by subscription, held by Mr. Baldwin, and, according to the testimony of William H. Law, finally paid over to C. F. Underhill, the president of the Flour City. The transfer failed of completion for the Flour City went into the hands of a receiver. The notes thus became worthless. None of the $11,000 went into the treasury of the Life Union. The defendant, Wilson, was elected a director June 16, 1891, and resigned

May 20, 1892. He had been vice president, and resigned such office December 15, 1891. He was made a member of the executive committee on September 30, 1891, and continued as such down to April 1, 1892. His friend Baldwin, and Mr. Law, whom he saw frequently, were also members of the executive committee. Up to the time of his own resignation the defendant sat at the meeting of the directors, and voted upon the resignation of old directors and the election of Levy and his friends to fill the vacancies. He was present at the meeting at which Louis P. Levy was elected president of the Life Union, after which, and at the same meeting, defendant's resignation was presented and accepted, and a friend of Levy was elected in his place. At a meeting of the directors of the Life Union held September 30, 1891, at which Wilson was present, a resolution was adopted that such legal steps be taken as might be necessary to recover the notes and cash paid to the representatives of the Flour City Company, the expenses to be borne by the Life Union and six trustees, of whom Wilson was one. On March 28, 1892, a circular entitled "The Life Union Vindicated," dated February 27, 1892, was issued, and published in the New York Tribune. This circular was signed by members of the executive committee, one of whom was Wilson, and the portion of it in which we are here interested reads as follows:

"The thirty-five thousand dollar notes given by the Life Union were specially printed contract notes payable out of the expense funds derived from the transferred membership of the Flour City. No such transfer took place. Therefore, the consideration having failed, the notes were worthless. The directors have lost eleven thousand dollars. The company lost nothing."

The scheme of transferring the control of the Life Union to Louis P. Levy was fully carried out, and on the part of Levy his agreements were fulfilled by the payment of the moneys in several installments to Lloyd from time to time, for which Levy received notes pro tanto. Lloyd gave the money to Law as fast as he received it from Levy. The payments were made in Lloyd and Law's office in their presence. Law and Lloyd gave Levy the notes representing the amount paid. The total amount paid was $12,000, representing the $11,000 principal of the notes and $1,000 interest. The payments extended from February to the latter part of May, 1892. All payments were made to Lloyd in bills, and were so handed over to him by Law. Contemporaneously Wilson gave up his notes, and got money in bills by installments $2,000 and interest from Baldwin, to whom the money had been paid by Law. The last installment was paid to Wilson a day or two after his resignation on May 20, 1892.

So far as the law of this case is concerned, it has been settled by decisive authority that the proposed scheme of the Life Union to purchase the Flour City Association was illegal, ultra vires, and that the notes given to carry out the arrangement were executed without authority, and were void (McClure v. Levy, 147 N. Y. 215, 41 N. E. 492); and that, so far as the persons participating in the transaction were concerned, and who received money in payment of such notes with knowledge of the source of the payment, such moneys were unlawfully paid, remained the property of the association, and could be recovered by its representatives in an action for that

purpose (McClure v. Law, 161 N. Y. 78, 55 N. E. 388, 76 Am. St. Rep. 262); that as to a director of the corporation, who was a holder of one of the notes, but had resigned his directorship prior to the time when the scheme was formulated for the purpose of unlawfully transferring the control of the association, had no knowledge thereof, and did not participate therein, he was not chargeable with moneys paid to him in payment of one of the notes, it appearing that he acted in good faith; that it could not be said that he parted with no value by the surrender of the note, for, while the same was not a binding obligation upon the Life Union, it might be that a right of action existed to enforce the same against the Flour City Association, or against the persons who received the money represented by the note (McClure v. Trask, 161 N. Y. 82, 55 N. E. 407). This case, therefore, comes to rest upon the fact as to whether the defendant herein had knowledge of the unlawful scheme and the source of the moneys which he received in payment of the two notes held by him. It is undisputed that from June 16, 1891, down to May 20, 1892, the defendant acted as a director, was elected a member of the executive committee of the board, and was for a time vice president of the company. On the day when Law resigned as president and Levy was elected in his place, the defendant participated in the action, and when it was consummated immediately resigned; so that during the whole period from the time of the execution of the first agreement, which marked the inception of the scheme, down to the time of its consummation, the defendant was an active participant in all of the transactions by which it was carried out. As a director, he was chargeable with such knowledge as he gained in that capacity, or might have learned by the exercise of reasonable care. He could not blindly shut his eyes to what was transpiring about him, and shelter himself behind the claim that he was merely acting in the interest of a friend, and knew nothing of what he was doing. The whole subject of the issuing of the notes, the attempted purchase of the Flour City Association, and the fact that the notes were invalid must have been known to him, because he signed the circular which was promulgated over his signature, and which recited all of the facts, and some things that were not facts. The acts of the defendant are to be measured and his knowledge inferred from what transpired while he was a director, applying thereto by reasonable interpretation of his acts the knowledge that was fairly necessary in their performance. Knowledge, where fraud is charged, is in most cases a matter of inference; and, where a state of facts is developed from which different inferences may be drawn, a jury is authorized to draw the same, and may characterize the act from all that appears, and, if the inference which the jury draw is not unreasonable, it will be sanctioned. Bagley v. Bowe, 105 N. Y. 171, 11 N. E. 386, 59 Am. Rep. 488; Gray v. Bicycle Co., 167 N. Y. 348, 60 N. E. 663, 82 Am. St. Rep. 720

The jury were authorized to find that the payment of the money by Baldwin to the defendant was quite exceptional in character. Both of these men were business men. Baldwin was the cashier of a bank, and the defendant was entirely familiar with business methods. Bald-

.win received the money from Law which was paid upon the unlawful agreement, and from time to time he gave to the defendant sums of money in bills, and, although he was the cashier of a bank, that usually deals largely in evidences of money, yet nothing was made to appear to show by check, entry, or otherwise what this transaction was. It was a payment upon what the defendant knew had been characterized as a void obligation. Baldwin had in no measure guarantied the payment of these notes to the defendant, nor was he under any legal liability therefor, and it may fairly be inferred that business men do not usually pay obligations out of their own pocket upon which exists no legal liability which may be enforced. There was nothing in the transaction between Baldwin and the defendant, so far as developed by this record, which created against the former even a moral obligation to return the money. A mere representation that a given security is good investment, where the security is not owned by the person making the representation, and he receives no benefit therefrom, and the person purchases of his own volition, creates no liability against the person making the representation, either moral or otherwise, and is not so unusual in character as that such person feels called upon to pay the amount of the investment if it happen to turn out to be bad. The particular circumstances, therefore, that the defendant bought these notes, acted as a director during the period specified, participated in the furtherance of the scheme that transferred the control of the association to Levy pursuant to the agreement, and severed his connection the moment it was consummated, received payment in bills from Baldwin of the notes, and Baldwin received money from Law, the proceeds of the illegal action in bills, together with all the other circumstances which the case presents were sufficient for the jury to find that the defendant received payment of the notes, that it was of money belonging to the association, and that he had knowledge of its source. The charge of the court to the jury was clear, full, and complete of all these matters. In fact, it was a model charge in presentation to the jury of the questions which they were called upon to decide. We think their verdict was justified, and should receive support by this court.

The judgment and order should therefore be affirmed, with costs. All concur.